**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RATNESH SHARMA,
     *Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,
     *Respondent.*

No. 04-76624

Agency No.
A079-566-588

RATNESH SHARMA,
     *Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,
     *Respondent.*

No. 05-72456

Agency No.
A079-566-588

RATNESH SHARMA,
     *Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,
     *Respondent.*

No. 09-71104

Agency No.
A079-566-588

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
September 14, 2010—San Francisco, California

Filed February 1, 2011

1989

Before: J. Clifford Wallace and Sidney R. Thomas,
Circuit Judges, and Richard Mills, Senior District Judge.*

Opinion by Judge Wallace;
Partial Concurrence and Partial Dissent by Judge Thomas

---

*The Honorable Richard Mills, Senior United States District Judge for the Central District of Illinois, sitting by designation.

## COUNSEL

Hardeep Singh Rai, San Francisco, California, for the petitioner-appellant.

Joshua Michael Levin, Senior Trial Attorney; Siu P. Wong, Trial Attorney; Kathryn Deangelis, Attorney; Kristina Rencic Sracic, Trial Attorney, Department of Justice, Washington, D.C., for the respondent-appellee.

## OPINION

WALLACE, Senior Circuit Judge:

Ratnesh Sharma petitions for review of the dismissal of his appeal by the Board of Immigration Appeals (Board). The

Board reviewed favorably the decision of the immigration judge (IJ), which denied Sharma's application for asylum, withholding of deportation, and protection under the Convention Against Torture (CAT). The Board then denied Sharma's subsequent motion to reopen his removal proceedings. We have jurisdiction to review orders of removal and denials of motions for reopening pursuant to 8 U.S.C. § 1252. We deny review of the petition.

## I.

Sharma, a native of India, entered the United States in 2001 and overstayed his visa. He filed an asylum application and was placed in removal proceedings. His asylum application was heard by an IJ. The facts are essentially taken from his testimony before the IJ.

According to Sharma, the police stationed where he lived in India persecuted him because they thought he was a political operative working against the government's interests. Sharma is a Hindu. His trouble began when his father, a professor at a university in India, started research for a book about a Sikh separatist movement. Because Sharma's father planned to detail police misconduct in the book, the police viewed his effort as anti-government. Sharma began assisting his father with the book in 1999. Sharma's help was mostly clerical: he entered interview data in a computer, and performed some photocopying.

In September 1999, shortly after beginning to help his father, Sharma was at his father's home when the police entered. They stated that they were looking for Sharma's father and asked Sharma where he was. When Sharma told them he did not know, they took Sharma with them to look for his father. After their search proved unsuccessful, they returned to the police station with Sharma. While there, the police interrogated Sharma about his father. They wanted to know about his father's research and the location of his

father's research data. They threatened Sharma, telling him that they would hurt him if he did not cooperate in providing them with the information and the data. After several hours, they released him. At no point during this discussion did police ever question Sharma about his personal views.

Two days later, the police again took Sharma. They interrogated him about the research that his father planned to use in the book. When Sharma indicated he neither had it nor had access to that research, they struck his back with belts and a baton. They released him after four hours.

Sharma then started photocopying the research data before ostensibly complying with the police by giving them the original research, 20-25 pages at a time. He did this for about four months, but after the police learned about the photocopying, they once more took Sharma to the station, interrogated him about the photocopies, and beat him when they were unsatisfied with his explanation. They then held Sharma for three days until his father came to the police station, gave the police all copies of his research, and promised to stop his research on the Sikh movement.

Sharma testified that after this last episode, the police came to the family home and told his father that if he did not give them a complete copy of the research, they would kill Sharma. Sharma's father then abandoned his plans to publish the Sikh book. At this point, Sharma left the family home and lived elsewhere in India for about sixteen months. He then procured a passport and visa prepared by an "agent" and departed to the United States. Upon departure, the police allegedly told Sharma's father that if Sharma returned to India, they would torture and kill him.

The IJ denied Sharma's asylum application based on a finding that his testimony lacked credibility. The Board disagreed with the IJ's credibility reasoning but nevertheless affirmed

the decision, holding that there was no evidence that Sharma was persecuted on account of his political beliefs:

> The respondent believes that the police harassed him in order to stop his father from publishing his book. He believes the police could not directly oppose his father. We do not find that the police attributed a political opinion to the respondent. Rather, the respondent was a tool used by the police to force their [sic] father to divulge information and to cease his activities.

Approximately one and a half months after the Board issued its decision, Sharma married a United States citizen. One and a half months after his marriage, Sharma filed a timely motion to re-open on the ground that he was married to a United States citizen. He argued that he was now eligible for adjustment of his status pursuant to a lawful, bona fide marriage.

The Board disagreed. It ruled that Sharma failed to rebut the presumption, applicable to all marriages entered into after the initiation of removal proceedings, that he entered the marriage for the purpose of "procuring [his] admission as an immigrant." *See* 8 U.S.C. § 1255(e)(3); 8 C.F.R. § 204.2(a)(1)(iii)(A)-(B).

Sharma subsequently filed two more motions to reconsider, which were both denied. Sharma now petitions for review of all of the Board's adverse rulings.

## II.

Sharma first takes issue with the Board's determination that he was not persecuted on account of an imputed political opinion, and that Sharma was instead persecuted based on the government's desire to disrupt his father's scholarly work.

**[1]** Eligibility for asylum requires showing a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). Mandatory withholding of removal requires a clear probability of the same. 8 C.F.R. § 1208.16(b)(2); *Al-Harbi v. I.N.S.*, 242 F.3d 882, 888 (9th Cir. 2001). *Sangha v. I.N.S.* provides the facts that Sharma must prove to establish a well-founded fear of persecution:

> After [the Supreme Court's decision in] *Elias-Zacarias*, an asylum seeker claiming to be a victim of persecution on account of his or her political opinion must establish, by evidence, four facts: (a) that he or she has been a victim of persecution; (b) that he or she holds a political opinion; (c) that this political opinion is known to or imputed by the persecutors; and (d) the ensuing persecution of the victim has been or will be on account of this opinion.

103 F.3d 1482, 1487 (9th Cir. 1997). We will reverse the Board's determination only if "the evidence [the alien seeking asylum] presented was so compelling that no reasonable fact-finder could fail to find the requisite fear of persecution." *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). This is known as the "substantial evidence" standard. *Sangha*, 103 F.3d at 1487.

**[2]** The dispositive consideration in this case is whether Sharma established the fourth *Sangha* fact: whether the "persecution of the victim has been or will be on account of [a political] opinion." *Id.* at 1487. Either the police harmed Sharma because of an imputed political opinion, or they did so, as the government argues and the Board found, solely as a means to convince his father to stop working on the Sikh book. Given the Board's credibility finding, "the issue is not whether the events in question took place, but rather whether they establish persecution" on the basis of an enumerated ground. *Navas v. I.N.S.*, 217 F.3d 646, 657-58 (9th Cir. 2000).

We conclude that this case is governed by our earlier decision in *Sangha*. In *Sangha* we held that the petitioner failed to meet his burden of proving that an imputed political opinion was the basis for the alleged persecution. There, the alien's father was the member and leader of a political party. 103 F.3d at 1486. Shortly after Sangha's father gave a speech criticizing the Bhindrawala Tiger Force (BTF) terrorist group,

> four armed men forced their way into the Sangha home. They beat up Sangha's father until Sangha and his brother came to protect him. The men identified themselves as members of the BTF. They demanded that Sangha's father cease his political activities, pay them 100,000 rupees, and give over Sangha and his brother. They said they wanted the two brothers to fight for Khalistan and they wanted to make the brothers unavailable to support the father. They gave Sangha's father three weeks to comply.

*Id.* Ruling on the above evidence, the Board found that Sangha was not persecuted on account of his political views. *Id.* On appeal, we held that substantial evidence did not compel us to find otherwise. The BTF "gave two reasons why it wanted to recruit Sangha," we explained:

> First, it wanted Sangha to help fight for Khalistan. This reason suggests that it was acting in furtherance of its own goals, rather than to persecute Sangha for any views he might hold. Second, the BTF wanted to make Sangha unavailable to support his father. This reason suggests that it wanted to punish Sangha's father, rather than to persecute Sangha for his political beliefs.

*Id.* at 1490-91. Because neither reason showed that the BTF was acting on account of Sangha's political opinion, we denied his petition. *Id.* at 1491.

**[3]** In the case before us, the motivation of the police was clear: stop Sharma's father from publishing his book. The police never inquired into Sharma's own political views. When they picked him up, their sole inquiry pertained to the status of his father's book. The police, according to Sharma's hearsay recounting of what his father told him, did continue to threaten Sharma after he came to the United States. But, because it is hearsay, the immigration tribunals were permitted to give this evidence less weight than the other evidence in the record. *Gu v. Gonzales*, 454 F.3d 1014, 1021 (9th Cir. 2006). That evidence overwhelmingly leads to the finding that the police wanted to stop the publication of Sharma's father's book rather than persecute Sharma for his political beliefs. *See Sangha*, 103 F.3d at 1491.

The thoughtful dissent suggests that *Silaya v. Mukasey*, not *Sangha*, is the controlling precedent. 524 F.3d 1066 (9th Cir. 2008). The facts of *Silaya* are these: Rosalina, the applicant, was the daughter of Estaqiou, a man with well-known political opinions. *Id.* at 1068. Members of the New People's Army (NPA), a violent anti-government group with a politically-motivated grudge against Estaqiou, kidnapped, raped, and tortured Rosalina. *Id.* at 1068-69. The record made clear that the NPA members knew that Rosalina was the daughter of Estaqiou—they had asked Estaqiou about her and, when they kidnapped her, did the act from his house. *Id.* at 1068-71. Apart from the circumstances of the kidnapping, the only indication of the NPA members' motive was their statement to Rosalina explaining that they were hurting her "so she will learn her lesson." *Id.* at 1072. The Immigration Judge and the Board, after reviewing the record, found that Rosalina had not established a nexus between the persecution and Rosalina's political opinion. *Id.* at 1070. Rosalina petitioned for appeal.

In granting Rosalina's petition, we held that, although there was scant direct evidence of the NPA members' motives, there was substantial circumstantial evidence that they imputed a political opinion to her. *Id.* at 1072. It was enough,

we reasoned, that "the NPA members knew who [Rosalina] was, knew who her father was, and made comments indicating that Rosalina was chosen as a victim because of her father's ties to the Philippine government." *Id.* That holding parallels our statement of the law in *Navas*, another case involving the persecution of a family member of someone with well-known political views: "Where police beat and threaten the spouse of a known dissident, it is logical, *in the absence of evidence pointing to another motive*, to conclude that they did so because of the spouse's presumed guilt by association." 217 F.3d at 659 n.18 (emphasis added).

The differences between the facts of *Silaya* and the ones here are important. In *Silaya*, we had very limited information regarding the NPA's motives. From the circumstances of the abduction and the NPA's knowledge regarding Rosalina's father, we drew the logical inferences regarding the NPA's motives. Here, however, we have extensive evidence of the police's motives. Every time the police took Sharma to the police station they indicated that they wanted "to force [Sharma's] father to divulge information and to cease his activities."[1] With this additional "evidence pointing to another motive," *Navas*, 217 F.3d at 659 n.18, *Silaya* is not on point and we are thus not compelled to find that the police persecuted Sharma on account of a political opinion imputed to him. *See Sangha*, 103 F.3d at 1487.

---

[1]The dissent also proposes that statements within the record constitute direct evidence that Sharma was beaten "on account of his father's beliefs which they imputed to him." Dissent at 2005. We respectfully disagree that these isolated statements are substantial evidence that compel us to reverse the Board's decision. We are required to look at the "record considered as a whole" in assessing whether a petitioner established eligibility for asylum. *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Neither Sharma's isolated statement, made once and without any context, that the police accused him of helping Sikh terrorists nor Sharma's neighbor's hearsay statement that the police accused Sharma of being "anti Govt[sic]," viewed in the context of the record as a whole "compels" the conclusion that he has a "well-founded fear" that he will be persecuted because "of a political opinion, imputed or direct. *Id.* at 483.

**[4]** Because he was not persecuted on account of his political views, Sharma has no fear of future persecution on account of those views. We therefore deny his petition for asylum and withholding of removal.

### III.

**[5]** Sharma also challenges the Board's denial of his request for relief under CAT. To obtain CAT protection, an applicant must show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). As set forth earlier, Sharma's father abandoned plans to publish his book, turned over his research to the police, and remained employed and unharmed in India. Because the police were using Sharma as a tool to stop his father from publishing the book, and the publishing has been abandoned, substantial evidence supports the Board's finding that it is not more likely than not that Sharma will be persecuted, let alone tortured by the Indian police upon his return. We therefore deny his petition for review based on the CAT claim.

### IV.

Sharma next argues that the Board abused its discretion in denying his first motion to reopen based on insufficient evidence of a bona fide marriage. We apply an abuse of discretion standard to decisions by the Board regarding motions to reopen. *I.N.S. v. Doherty*, 502 U.S. 314, 323 (1992).

**[6]** When an alien enters into a marriage following the completion of removal proceedings, it is presumed that the purpose is to "procur[e] the alien's admission as an immigrant." *See* 8 U.S.C. § 1255(e)(3); 8 C.F.R. § 204.2(a)(1)(iii)(A)-(B). To overcome this presumption, an applicant filing a motion with the Board to reopen removal proceedings must " 'present[ ] clear and convincing evidence indicating a strong likelihood that the [petitioner's ] marriage

is bona fide.' " *Malhi v. I.N.S.*, 336 F.3d 989, 994 (9th Cir. 2003), *quoting In re Velarde-Pacheco*, 23 I. & N. Dec. 253, 256 (BIA 2002).

**[7]** "[A]n applicant must offer evidence that is probative of the motivation for marriage, not just the bare fact of getting married." *Malhi*, 336 F.3d at 994. The types of evidence which tend to show a bona fide marriage include documents demonstrating "joint ownership of property," a "[l]ease showing joint tenancy of a common residence," "[d]ocumentation showing comingling of financial resources," "[a]ffidavits of third parties . . . contain[ing] complete information and details explaining how the person acquired his or her knowledge of the marriage," and "[a]ny other documentation which is relevant to establish that the marriage was not entered into in order to evade the immigration laws of the United States." 8 C.F.R. § 204.2(a)(1)(iii)(B)(2-3, 5-6).

Within 90 days of the Board's denial of his appeal, Sharma got married. His wife then filed an I-130, and Sharma moved to reopen the case he had lost. Attached to his motion to reopen was a copy of a car title and insurance in both his and his wife's names, utility bills in both names, bank account information in both of their names, his wife's home rental agreement with an addendum adding Sharma but unsigned by the landlord, welfare food stamp reports in which Sharma and his wife are treated as a couple, sworn affidavits regarding the marriage from Sharma's wife, greeting cards between Sharma, his wife, and her daughter, letters from relatives congratulating him on his marriage, and his wife's I-130 application which included his marriage certificate, photographs, and further affidavits.

Few published cases hold that the Board either did or did not abuse its discretion in denying a motion to reopen for purposes of asserting a recent marriage to a United States citizen. Only a few cases further address whether an alien has met his burden of presenting clear and convincing evidence of a bona

fide marriage. In *Malhi*, the applicant simply presented a marriage certificate, his wife's birth certificate, four photographs and a receipt for an I-130 filing. 336 F.3d at 994. We denied the petition from the Board's rejection of his motion to reopen. *Id.* Similarly, in *Ahmed v. Mukasey*, we held:

> The only documents pre-dating April 2004 were (1) a copy of her marriage certificate and license; (2) the visa application; (3) photographs; and (4) one joint phone bill for $3.26 from March 2004. These documents were insufficient to prove, by clear and convincing evidence, that her marriage was bona fide.

548 F.3d 768, 773 (9th Cir. 2008), *citing Malhi*, 336 F.3d at 994. In *Damon v. Ashcroft*, on the other hand, we held that "proof that Sung Hee was listed on Scott's insurance policies, property leases, income tax forms or bank accounts, and testimony or other evidence regarding their courtship, wedding ceremony and whether they shared a residence . . . [,]" was sufficient to establish clear and convincing evidence of a bona fide marriage. 360 F.3d 1084, 1088 (9th Cir. 2004) (citation omitted). Similarly, the applicant in *Velarde-Pacheco* presented his son's birth certificate and proof of cohabitation, which the Board held to be a sufficient grounds to warrant reopening his case. 23 I. & N. Dec. at 256.

**[8]** Sharma submitted more information than the applicants in *Malhi* and *Ahmed*, but he submitted less information regarding cohabitation than the applicant in *Damon*, and he does not have a child, as in *Velarde-Pacheco*. "[A]n applicant must offer evidence that is probative of the *motivation* for marriage, not just the bare fact of getting married." *Malhi*, 336 F.3d at 994 (emphasis added). All of Sharma's evidence goes to the fact that he and his wife did have a marriage ceremony and joined their lives, to some extent, after the fact. What it does not do, however, is show any evidence of courtship or commingling of lives before their marriage. For example, while Sharma provided evidence that he and his wife

commingled some of their funds and added Sharma's name to some of their agreements, their affidavits regarding their marriage provide no details regarding the courtship or rationale for their marriage. Sharma's wife's affidavit states, in its entirety:

> I, Athena Diane Sharma, met my husband, Ratnesh Sharma, in the beginning of the year 2004.
>
> When he moved here from San Francisco, I met him at the store where he is employed. We spent some time together, and on my birthday, August 28, he proposed marriage to me, which I accepted. We decided to get married at the beginning of the year, 2005 [and] we have been together ever since.
>
> We were married on January 12, 2005 in the presence of a few close friends. Ratnesh moved in with me at that time, where we still reside.

It goes without saying that this affidavit does nothing to establish that Sharma's motivation to marry was bona fide. That fact, coupled with the absence of any evidence regarding Sharma's and Athena's courtship lead us to conclude that the Board did not abuse its discretion in denying Sharma's motion to reopen. The utility bills and greeting cards are of little help in overcoming the presumption of invalidity.

## V.

Sharma brought a second and a third motion to reopen. Generally a petitioner is entitled to file only one motion to reopen, which must be filed within ninety days of the date of entry of the Board's final decision. 8 U.S.C. § 1229a(c)(7)(A); 8 C.F.R. § 1003.2(c)(2). Although the Board has discretion to reopen removal proceedings "on its own motion" "at any time" pursuant to 8 C.F.R. § 1003.2(a), we lack jurisdiction to review the Board's decision not to

invoke its *sua sponte* authority to reopen those proceedings. *See Ekimian v. I.N.S.*, 303 F.3d 1153, 1159 (9th Cir. 2002). Here, Sharma contends that his second and third motions to reopen should not count as number or time-barred, but he cites no published authority supporting his argument, and we are aware of none. We therefore hold that we lack jurisdiction to review Sharma's second and third motions to reopen.

## VI.

Sharma's due process argument fares no better. Sharma argues that the Board violated his due process rights by denying his time and number-barred motions to reopen. "Deportation proceedings violate due process if the alien does not receive a full and fair hearing and suffers prejudice as a result." *Perez-Lastor v. I.N.S.*, 208 F.3d 773, 777 (9th Cir. 2000). Because Sharma "does not contend that [he] was prevented from presenting [his] case before the IJ, denied a full and fair hearing before an impartial adjudicator, or otherwise denied a basic due process right[,]" his petition fails. *See Martinez-Rosas v. Gonzales*, 424 F.3d 926, 930 (9th Cir. 2005), *citing* 8 U.S.C. § 1252(a)(2)(B)(i).

### PETITION DENIED.

---

THOMAS, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Sharma's petition should be denied as to his claim under the Convention Against Torture, his motions to reopen, and his due process claim. I accordingly join parts I, III, IV, V, and VI of the majority opinion. However, I would grant the petition as to the asylum claim. Therefore, I concur in part, and I respectfully dissent in part.

I

Our precedent holds that "evidence '[t]hat the alleged persecutor acted because of a petitioner's family's political associations is sufficient' to satisfy the motive requirement." *Silaya v. Mukasey*, 524 F.3d 1066, 1070-71 (9th Cir. 2008) (quoting *Kebede v. Ashcroft*, 366 F.3d 808, 812 (9th Cir. 2004) (citing *Lopez-Galarza v. I.N.S.*, 99 F.3d 954, 960 (9th Cir. 1996))). Sharma has made the requisite showing here. At the time of his persecution, he was assisting his father, a history professor, with a book he was writing on Sikh nationalism. Sharma's family "did not support" Sikh nationalism, but "did support the rights for which [the Sikhs] were fighting." Sharma's father and grandfather were both members of India's Congress Party in the early 1980s (with Sharma's grandfather occupying senior Party positions), but they left the Party to protest its violence against the Sikhs. Thereafter, Sharma's father "guided" the Sikh Students Federation at Guru Nanak Khalsa College, where he taught. Sharma's father testified that, "My work has lead [sic] me to be arrested and harassed and my son to suffer the brunt of the wrath of the Indian Government through the Punjab Police."

Quoting *Bhasin v. Gonazales*, 423 F.3d 977, 985 (9th Cir. 2005), the government repeats the old saw that "persecutors 'do not always take the time to tell their victims all the reasons' they are being harmed." Here, however, Sharma's persecutors *did* tell him why he was being detained and beaten: on account of his father's political beliefs, which they imputed to him. Sharma testified that, as he was being beaten, the police "accused [him] and [his] father of helping the [Sikh] terrorist[s]." Sharma also testified that the police accused him of "trying to protect [his] father's propaganda." Sharma's neighbor recounted that "[t]he police *accused . . . Sharma of being anti Govt* and harassed him to prevent his father . . . from working on his research." The record compels the conclusion that Sharma's persecutors attributed his

father's political opinion to him and persecuted him on account of it. *Silaya*, 524 F.3d at 1070.

If the police persecuted Sharma in part, or even primarily, to "stop Sharma's father from publishing his book," that ought have no effect on Sharma's asylum claim. Sharma's undisputed testimony, which the BIA found credible, establishes that Sharma's persecution was politically motivated. "[W]here a persecutor has [mixed] motives for retaliating against a political opponent, the persecutor's mixed motives do 'not render the opposition any less political, or the opponent any less deserving of asylum.' " *Zhu v. Mukasey*, 537 F.3d 1034, 1043 (9th Cir. 2008) (quoting *Grava v. INS*, 205 F.3d 1177, 1181 n. 3 (9th Cir. 2000)). And the fact that "[t]he police never inquired into Sharma's own political views" is equally immaterial. In *Silaya*, we found substantial evidence compelling a conclusion of persecution on account of a political opinion where "the [persecutors] knew who [the petitioner] was, knew who [the petitioner's] father was, and made comments indicating that [the petitioner] was chosen as a victim because of [the petitioner's] father's [political views]." 524 F.3d at 1072. We characterized these as the facts "necessary to prove an imputed political asylum claim," and did not require the petitioner to make any showing that the persecutors inquired after the petitioner's own political opinions. *Id.* Sharma has put forward ample evidence demonstrating these facts, and his petition for review ought to be granted.

*Sangha* does not compel a contrary conclusion. There, we held that "[i]f the persecutor attributed a political opinion to the victim, and acted upon the attribution, this imputed view becomes the applicant's political opinion as required under the [INA]." 103 F.3d at 1439. Here, as described above, Sharma has shown "that his persecutors actually imputed a political opinion to him." *Id.* By contrast, the court in *Sangha* relied on the fact that, there, the persecutors "never expressly said that [they were persecuting] Sangha because of his father's views," 103 F.3d at 1489-90, and in prior altercations

had focused entirely on Sangha's father, and not Sangha, *id.* at 1490. Whereas Sangha's persecutors "ignored" him, *id.*, Sharma's persecutors—in the words of the government— "targeted" him, in part because they knew that his father's political ties made his father immune from harassment. Our decision in *Sangha* supports Sharma's claims.

## II

The government asserts that, even if we were to hold that Sharma had suffered past persecution, a change in circumstances undermines any presumption that Sharma's fear of future persecution is well-founded. Where there is past persecution, "a rebuttable presumption of a well-founded fear arises . . . and the burden shifts to the government to demonstrate," by a preponderance of the evidence, "that there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear." *Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004) (citing 8 C.F.R. § 1208.13) (internal quotation marks omitted). Here, the government has not met its burden.

First, the BIA's conclusion that "[t]here is no recent evidence to corroborate [Petitioner's] claim that the authorities would still wish to harm" him is premised on a misreading of the record. In its initial decision, the BIA recounted that Sharma was threatened with death by the police only before his father delivered his research materials to them, and concluded therefore that the danger to Sharma had passed. However, the BIA misstated the record, which shows that Sharma's persecution persisted after his father handed over his research and stopped working on his book. In late 1999, Sharma and his father began delivering Sharma's father's research to the police in order to mollify them. Despite this, on January 24, 2000, the police detained Sharma for three days and beat him "every day." Sharma was released when his father "agreed that he would stop his research and hand . . . over the papers" to the police, which he did. Nonetheless,

shortly thereafter the police visited Sharma's home, told his "father that the research papers [were] not complete," and threatened that they would kill Sharma. Sharma also testified that, in the years since he left India, the police have continued to visit his family's home and to threaten to kill him if he returns. Therefore, as the government acknowledges, the BIA erred when it found that Sharma was only threatened prior to his father promising to cease work on his book and hand over his research materials.

The government points to additional reasons why Sharma's claim of a well-founded fear is undermined, but it does not rebut the presumption that operates in Sharma's favor. The government emphasizes that Sharma's father remains unharmed and cites *Hakeem v. INS*, 273 F.3d 812 (9th Cir. 2001), for the proposition that Sharma's claim is "weakened, even undercut, when similarly-situated family members continue to live in the country without incident." *Id.* at 816. But "the facts in *Hakeem* are entirely distinguishable from those in this case; critically, the family members at issue in *Hakeem* were in fact 'similarly situated,' whereas here they are not." *Kumar v. Gonzales*, 444 F.3d 1043, 1055 (9th Cir. 2006). Hakeem's family members remained safe in Hakeem's former home despite changing their religion—the very same behavior on account of which Hakeem claimed threats and sought asylum. *Id.* Here, Sharma testified that his father's immunity from violence and direct threats is explained by his father's standing and "links" in the community. Sharma was targeted, in part, because his father could not be. Sharma and his father are not similarly situated.

The government also notes that Sharma "received a valid passport and visa at a time Indian authorities 'were allegedly interested him,'" and cites *Espinoza-Martinez v. INS*, 754 F.2d 1536 (9th Cir. 1985), for the proposition that "easy acquisition of [a] passport cuts against petitioner's argument that he will be individually persecuted upon return." However, it was not at all "easy" for Sharma to acquire the pass-

port and visa that enabled him to leave India and enter the U.S. While he had gotten and renewed a passport through normal channels in the past, in order to procure a passport after the police harassment began, Sharma paid an "agent" 750,000 rupee, or more than $16,000 at today's exchange rate of 46 rupee per dollar. *Espinoza* is distinguishable, as there, the petitioner "acquired a . . . passport without difficulty." 754 F.2d at 1540.

## III

Substantial evidence supports the conclusion that Sharma was persecuted on account of a protected ground, and that the government has not met its burden of rebutting the presumption that Sharma has a well-founded fear of future persecution. I would grant the petition for review as to Sharma's asylum claim.