OPINION
BYBEE, Circuit Judge:
Jagtar Singh, a native and citizen of India, petitions for review of a Board of Immigration Appeals (BIA) order concluding that he is ineligible for withholding of removal. The sole question before us is whether substantial evidence supports the BIA’s determination that the government showed that there has been a fundamental change in circumstances such that Singh’s life or freedom will not be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion if he is removed to India. Because substantial evidence supports the BIA’s decision, we deny the petition for review.
I
We begin by reciting the facts offered by Singh during his testimony before the Immigration Judge (IJ) and in his supporting declarations. Although the IJ determined that Singh’s testimony was not credible, the Board did not expressly adopt that finding in its order dismissing Singh’s appeal. ‘When the BIA’s decision is silent on the issue of credibility, despite an IJ’s explicit adverse credibility finding, we may presume that the BIA found the petitioner to be credible.” Krotova v. Gonzales, 416 F.3d 1080, 1084 (9th Cir.2005) (citations omitted). Accordingly, we refrain from adopting the IJ’s adverse credibility finding.
On August 18, 1999, Singh entered the United States without inspection. The Immigration and Naturalization Service (INS) served him with a notice to appear. Singh conceded that he was subject to removal and applied for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). The IJ held a merits hearing on September 9, 2003.
Singh is a Sikh who was born in India’s Punjab province. In March 1993, he joined the Akali Dal (Mann) political party, which supported the creation of an independent state for Sikhs in India called Khalistan. Singh owned trucks that he used to transport party members to rallies and to carry pro-Khalistan political posters.
On May 4, 1994, police stopped Singh while he was driving home from a political *829 meeting with two other party members. Police transported Singh to the station and detained him for four days because he was carrying pro-Khalistan posters in his truck. They questioned Singh about which terrorists he was meeting with and beat him with leather belts, wooden sticks, and a rifle butt. He was not released until his family, with the help of his village sarpanch, bribed the police.
On November 2, 1995, police detained Singh as he was returning from a political rally. They removed a banner from his truck that advertised the political rally and took him to the station. There, they detained Singh for ten days and beat him with sticks and straps. Once again they questioned Singh about aiding militants and terrorists. And once again police released Singh only after his family and village sarpanch paid a bribe.
On June 7, 1997, police arrested Singh for a third time. A bomb blast had occurred in the city where Singh was working, and police detained him at a checkpoint because he is a Sikh. Police questioned him about the blast for five days before transferring him to another station where he was beaten severely. After Singh fell unconscious from the beating, police delivered him to the hospital. He was released when a friend bribed the officer who was keeping watch. Singh fled the area and eventually entered the U.S. without inspection. In the meantime, Indian police continued to question and harass his wife, father, uncle, and cousin.
The IJ denied Singh’s application for asylum on the basis that it was time barred. The IJ further found that Singh’s testimony was not credible or corroborated. And he concluded that Singh was arrested for allegedly violating laws of general applicability rather than persecuted on account of a protected ground. The IJ therefore denied Singh’s request for withholding of removal and protection under the CAT. The BIA entered an order affirming the IJ’s decision to deny all three forms of relief.
In an unpublished memorandum disposition, we granted in part Singh’s petition for review. Singh v. Keisler, 249 Fed.Appx. 602, 603 (9th Cir.2007). We held that we lacked jurisdiction to review the determination that Singh’s asylum application was time barred. Id. at 602. And we agreed with the IJ and the BIA that’ Singh was not entitled to relief under the CAT. Id. at 603. With respect to Singh’s request for withholding of removal, we declined to adopt the IJ’s adverse credibility finding because the BIA had not done so. Id. at 602. We then held that substantial evidence did not support the determination that Singh’s second and third arrests were not motivated by a protected ground. Id. at 603. We therefore concluded that Singh had suffered past persecution, which gives rise to a presumption that he is eligible for withholding of removal. Id.
We remanded the case to the BIA, id., which in turn remanded to the IJ for further findings concerning Singh’s eligibility for withholding of removal. The IJ held a hearing on July 21, 2008. Singh testified that his wife and father had told him that police continued to visit their homes to inquire about his whereabouts. They demanded to know his contact information in the U.S. and left only after his father bribed them. He also submitted declarations from his wife, father, and village sarpanch stating that Indian police were still looking for him. The government responded by pointing out inconsistencies in Singh’s testimony and introducing documents indicating that conditions in India had changed for Sikhs who were members or supporters of groups like Akali Dal (Mann).
*830 On September 2, 2008, the IJ issued an order denying Singh’s application for withholding of removal. The IJ acknowledged that, pursuant to this court’s memorandum disposition, Singh had established that he suffered past persecution on account of a protected ground and that he was therefore entitled to a presumption that he would be persecuted if returned to India. See 8 C.F.R. § 1208.16(b)(l)(i). The IJ nevertheless concluded that the government had carried its burden to show by a preponderance of the evidence that there had been a fundamental change in circumstances so as to overcome the presumption that Singh would be persecuted if he were removed. See id. § 1208.16(b)(l)(i)(A). The IJ declared that Singh’s testimony that police continued to harass his family and search for him was not credible. He also analyzed the country reports and other documents submitted by both parties and concluded that there was no evidence that similarly situated individuals were being persecuted in India.
On May 26, 2010, the BIA dismissed Singh’s appeal. The Board did not adopt the IJ’s adverse credibility determination. Instead, the BIA agreed with the IJ’s assessment that “[t]he country information submitted by the Department of Homeland Security (DHS) reflects that conditions in India have greatly improved.” The Board quoted country reports from the U.S. Department of State and the U.K. Home Office to this effect. And it explained that “the Immigration Judge properly analyzed how changed country conditions affected [Singh’s] specific situation and was sufficiently individualized to provide substantial evidence for the conclusion that [Singh] failed to establish eligibility for relief.”
II
“We review petitions for review of the BIA’s determination that a petitioner does not qualify for asylum or withholding of removal under the highly deferential ‘substantial evidence’ standard.” Zetino v. Holder, 622 F.3d 1007, 1012 (9th Cir.2010) (citing INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). “Where the BIA issues its own decision but relies in part on the immigration judge’s reasoning, we review both decisions.” Flores-Lopez v. Holder, 685 F.3d 857, 861 (9th Cir.2012).
Ill
Because we previously determined that Singh had endured past persecution, Singh, 249 Fed.Appx. at 603, he is entitled to a presumption that his life or freedom would be threatened in the future if he is removed to India, 8 C.F.R. § 1208.16(b)(1)®. That presumption is rebutted if the government shows by a preponderance of the evidence that there has been a fundamental change in circumstances such that Singh’s life or freedom would not be threatened on account of a protected ground upon his return to India. Id. § 1208.16(b)(l)(i)(A).
The IJ and the BIA concluded that there had been a fundamental change in circumstances after interpreting and applying the country condition evidence submitted by the parties. Both the IJ and the BIA cited the State Department’s 2008 issue paper on the treatment of Sikhs in India, which explains that “[t]oday, conditions for Indian Sikhs differ dramatically from those of the 1980s and 1990s. Sikhs have ascended to the highest level of the Indian government.” See Kumar v. INS, 204 F.3d 931, 934 (9th Cir.2000) (reasoning that conditions had fundamentally changed where, inter alia, the petitioner’s political party had participated in elections). The issue paper acknowledges that “[h]uman rights abuses, including, torture, arbitrary arrest, and custodial rape, are still commit *831 ted by police throughout India. While conditions have improved since 1995 and progress has beeri rapid in the past 10 years, police impunity for committing human rights abuses remains a legitimate threat to all Indians.” But the paper concludes that “[t]here is no indication that Sikhs are singled out for such abuse or that such abuse occurs with either the overt or tacit consent of the Government of India.” See 8 U.S.C. § 1231(b)(3) (stating that an alien is eligible for withholding of removal “if the Attorney General decides that the alien’s life or freedom would be threatened in that country because of the alien’s race, religion, nationality, membership in a particular social group, or political opinion.” (emphasis added)). The issue paper further notes that “[a]ny current persecution of Sikhs based on political or religious beliefs would be widely covered by India’s vibrant and open media,” which lends a degree of confidence to the State Department’s assessment that individuals like Singh are not being persecuted on account of a protected ground.
The government also introduced the State Department’s 2007 country report on human rights practices in India. The thirty-four page report is devoid of any mention of recent or ongoing persecution of Sikhs, even though it extensively catalogs threats to human rights encountered by various political, religious, and ethnic groups in India. See Sowe v. Mukasey, 538 F.3d 1281, 1285 (9th Cir.2008) (“U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations.” (internal quotation marks and citation omitted)); Molina-Estrada v. INS, 293 F.3d 1089, 1096 (9th Cir.2002) (“Even in the face of a presumption of future persecution, a State Department report is relevant.”). The country report states that the Indian government continued to investigate reports of murder and illegal cremation during the 1980s and early 1990s in Punjab, and that a commission recommended compensating the family members of individuals who were killed by Indian police during that period. In 2005, India’s prime minister apologized to the Sikh community for atrocities committed in the 1980s and 1990s, two party officials resigned after being indicted for their role in the violence, and charges were reportedly filed against dozens of police officials. See Sowe, 538 F.3d at 1286 (explaining that conditions had fundamentally changed where, inter alia, the perpetrators of the past persecution were being held accountable by the government).
The reports acknowledge, however, that the government made “little progress” in holding hundreds of other police officers accountable for causing the death and disappearance of Sikhs in the 1980s and 1990s. India’s slow and uneven progress in prosecuting those responsible for past persecution is troubling. But.it does not mean that the Board’s decision is not supported by substantial evidence. We have repeatedly recognized that the IJ and the BIA are entitled to rely on country reports that contain mixed messages, ambiguities, or inconsistencies. See Gonzalez-Hernandez v. Ashcroft, 336 F.3d 995, 999 (9th Cir.2003) (“That the country report is somewhat contradictory or ambiguous [] does not render it useless to the changed country conditions inquiry.... [WJhen such a country report is at issue, it is entirely appropriate for the BIA to ‘bring its expertise to bear upon the matterf ]’ ... and decide which portions of the report are relevant to the applicant.” (quoting INS v. Ventura, 537 U.S. 12, 17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002)); see also Go v. Holder, 640 F.3d 1047, 1054 (9th Cir.2011) (“[The petitioner] correctly points out that the country reports de *832 scribe several instances of abuse and corruption within the [ ] criminal justice system. Nevertheless, other information contained in these reports supports the Board’s conclusion that torture is unlikely.”); Sowe, 538 F.3d at 1286 (“We are not in a position to second-guess the IJ’s construction of the somewhat contradictory [ ] country report.”). We would be overstepping our bounds if we reviewed the country reports de novo rather than affording the agency’s interpretation of the evidence its due deference. See Gonzalez-Hernandez, 336 F.3d at 1000 (“[T]he agency, not a court of appeals, must construe the country report and determine if country conditions have changed such that the applicant no longer has a well-founded fear of persecution.... [W]here the BIA rationally construes an ambiguous or somewhat contradictory country report and provides an individualized analysis of how changed conditions will affect the specific petitioner’s situation, substantial evidence will support the agency determination.” (internal quotation marks and citation omitted)); Marcu v. INS, 147 F.3d 1078, 1082 (9th Cir.1998) (“[Tjhere is a factual dispute regarding the current conditions in [the petitioner’s country of origin]. We do not solve this dispute. Our task is to determine whether there is substantial evidence to support the BIA’s finding, not to substitute an analysis of which side in the factual dispute we find more persuasive.”)).
The evidence introduced by the government is sufficiently individualized to address Singh’s claim that he will be persecuted because of his past involvement with the Akali Dal (Mann) party. See Popova v. INS, 273 F.3d 1251, 1259 (9th Cir.2001) (“The [government] is obligated to introduce evidence that, on an individualized basis, rebuts a particular applicant’s specific grounds for his well-founded fear of future persecution. Information about general changes in the country is not sufficient.” (internal quotation marks and citations omitted)). The government submitted a 2003 report by the Citizenship and Immigration Service (CIS), which observes that “[t]here is little recent evidence suggesting that members or supporters of the Akali Dal (Mann) party in Punjab are being systematically targeted for arrest or other forms of mistreatment by police.... [A]ny police abuse of Akali Dal (Mann) supporters would likely get press attention.” Furthermore, a human rights lawyer who is “active in Punjab human rights issues” reported in 2002 “that he was not aware of any recent arrests or incidents of harassment of Sikhs solely on account of their political views.” And “[a]dding to the notion that Sikhs are no longer targeted simply for holding pro-Khalistani views, two recent nongovernmental reports concluded that while torture is still a serious problem in Punjab, police generally no longer torture Sikhs on account of political views or suspected militant links. Amnesty International said in a January 2003 report that currently ‘the majority of victims are detainees held in connection with criminal investigations, and include members of all religious communities and social groups.’ ” Another 2003 report from the CIS notes that “several experts have suggested that only those considered by police to be high-profile militants are at risk.... Punjab police normally do not consider a person to be a high-profile militant ... simply for having strong political views or being politically active.” The evidence offered by the government thus expressly addresses the plight of individuals who, like Singh, were active supporters of Akali Dal (Mann) and related pro-Khalistani causes.
The CIS reports, like the State Department’s country report, contain some ambiguous and inconsistent language. *833 For example, one expert “speculated that it is possible that Punjab police at times arrest Akali Dal (Mann) supporters because they suspect them of being linked to secret factions within the Akali Dal ... [that] essentially operate as terrorist cells.” Another expert opined that “Punjabi Sikhs are likely targeted at times by local officials for holding pro-Khalistani views” by “rogue officers at the local level, perhaps for personal reasons” even though “this is not done systematically.” The expert added that it “seemed plausible” that “this harassment could include detention and physical abuse” though “she had no recent evidence of such treatment being meted out.” As we have already noted, it is well established that a decision is supported by substantial evidence despite the presence of conflicting or ambiguous information in the country reports. See Gonzalez-Hernandez, 336 F.3d at 999; see also Go, 640 F.3d at 1054; Sowe, 538 F.3d at 1286.
This is not a case where the record contained only limited information about the circumstances faced by the petitioner or consisted solely of unreliable or uncorroborated reports. See, e.g., Smolniakova v. Gonzales, 422 F.3d 1037, 1052 (9th Cir.2005) (observing that the government’s country condition submissions were limited to two newspaper articles, which are not authoritative evidence of country conditions); Mousa v. Mukasey, 530 F.3d 1025, 1030 (9th Cir.2008) (noting that the government relied on a single newspaper article as evidence of changed country conditions). In addition to the evidence already discussed, both the BIA and the IJ cited a 2007 operational guidance note from the U.K. Home Office, which echoes the U.S. State Department’s views in concluding that “[i]t is [] unlikely that individuals associated at a low or medium level with Sikh militant groups would be able to establish a well-founded fear of persecution.” The government’s submissions also included a 2008 country report from the U.K. and a 2000 report from Denmark. The IJ weighed the government’s documents alongside Singh’s country condition evidence, which consisted of reports from Amnesty International and Human Rights Watch. Like the State Department’s 2008 issue paper, these reports note that many of the police officers responsible for the atrocities committed against Sikhs in the 1980s and early 1990s have not been brought to justice. But the reports make no mention of either ongoing persecution of Sikhs or any risk of renewed persecution of individuals because they are Sikh, members of Akali Dal (Mann), or supporters of related pro-Khalistani causes.
The scope and precision of the country report evidence in the record distinguishes this case from the cases where we have deemed such evidence insufficient to support a determination that there has been a fundamental change in circumstances. See, e.g., Mutuku v. Holder, 600 F.3d 1210, 1213-14 (9th Cir.2010) (explaining that the lone country report offered by the government stated that political activists like the petitioner were still “routinely” persecuted and that “[n]othing” in the report indicated that conditions had changed for individuals like the petitioner); Ahmed v. Keisler, 504 F.3d 1183, 1197-98 (9th Cir.2007) (observing that the country report contained “numerous references” to persecution of similarly situated individuals and that the government had not offered evidence that conditions in the area where petitioner lived had improved).
The dissent relies on our unpublished memorandum disposition in (Kapur) Singh v. Holder, 372 Fed.Appx. 821 (9th Cir.2010), to argue that the country reports are not sufficiently individualized. The decision lacks precedential value. See 9th Cir. R. 36-3(a) (“Unpublished dispositions *834 and orders of this Court are not precedent.”)- To the extent that an unpublished memorandum disposition ought to inform our decision, we note that there are a number of memoranda that are consistent with our conclusion in this case. See, e.g., (Achhar) Singh v. Holder, 550 Fed.Appx. 487, 488 (9th Cir.2013) (“[A] Citizenship and Immigration Services report indicates that only a small number of high-profile Sikhs who have been implicated in political militancy remain at risk in India.... Although the record also contains some evidence of continuing harassment of Sikhs due to their suspected or actual pro-Khal-istani views, there is ample evidence supporting the IJ’s decision, and ‘[w]e are not in a position to second-guess the IJ’s construction of [a] somewhat contradictory ... country report.’ ” (alterations and omission in original) (quoting Sowe, 538 F.3d at 1286)); (Harpal) Singh v. Holder, 399 Fed.Appx. 310, 311 (9th Cir.2010); (Joginder) Singh v. Holder, 391 Fed.Appx. 666, 667 (9th Cir.2010) (“The country condition reports indicate that persecution in the Punjab region on account of Akali Dal Mann membership essentially ended as of the mid-1990s.”); Vaid v. Mukasey, 288 Fed.Appx. 321, 324 (9th Cir.2008).
In addition to requiring sufficiently individualized evidence of changed circumstances in the petitioner’s country of origin, see, e.g., Popova, 273 F.3d at 1259, we have also required the agency to “make an individualized determination ” of the petitioner’s claim for relief by “assessing the impact of changed country conditions on an individualized basis,” Lopez v. Ashcroft, 366 F.3d 799, 806 (9th Cir.2004) (emphasis added). In other words, we have not credited overbroad and conclusory statements that fail to reference relevant evidence. See, e.g., Gui v. INS, 280 F.3d 1217, 1229 (9th Cir.2002) (holding that an unsupported one-sentence statement that country conditions had changed “did not represent the kind of individualized analysis this court has required”).
Here, both the IJ and the BIA expressly applied the record evidence to Singh’s own individual circumstances. As noted, the orders cited the relevant portions of the issue papers published by the U.S. State Department and the U.K. Home Office. The excerpts quoted by the agency stated that it was unlikely that an individual would be persecuted either because he is a Sikh or because he is a member or supporter of political groups like Akali Dal (Mann). For example, the IJ noted that the U.K. operational guidance note “states that even actual members of militant separatist groups are not likely to be able to establish persecution.” He then applied this evidence to Singh’s particular circumstances, explaining that “[t]he most [Singh] claims is that police suspected him of aiding members a decade ago. But if the members themselves are not subject to persecution, it makes no sense to believe that mere sympathizers are at risk of persecution.” The IJ once again revealed that he had considered the specific grounds for possible persecution raised by Singh when he concluded that “it is clear from the foregoing [evidence] that [Singh’s] mere membership in the Akali Dal Mann Party provides no basis, in today’s India, for a finding that he will be persecuted.”
In short, the agency identified the particular grounds on which Singh claimed he might be persecuted and cited specific relevant evidence showing that persecution on those grounds is unlikely. That is the very definition of the individualized determination that our case law requires. See Chand v. INS, 222 F.3d 1066, 1079 (9th Cir.2000) (“[T]he determination of whether or not a particular applicant’s fear is rebutted by general country conditions information requires an individualized analysis *835 that focuses on the specific harm suffered and the relationship to it of the particular information contained in the relevant country reports”).
The agency’s application of the country condition evidence to Singh’s testimony distinguishes this case from the cases where we have held that the analysis is not sufficiently individualized. See, e.g., Ali v. Ashcroft, 394 F.3d 780, 788 (9th Cir.2005) (“The only information specific to [the petitioner] that the IJ cites is that there is no evidence of ‘genocide or imprisonment’ of members of her clan. The IJ fails to discuss both the persecution that [the petitioner] experienced on account of her political opinion, and whether the circumstances have changed such that she no longer needs to fear retaliation.”); Garrovillas v. INS, 156 F.3d 1010, 1017 (9th Cir.1998) (“The BIA did quote two paragraphs of a State Department report finding generally improved conditions in the [petitioner’s country of origin], but did not discuss its applicability to [the petitioner]. Thus, it is not clear whether this quotation was intended to serve as a means of rebutting the presumption of a well-founded fear of future persecution.”).
Furthermore, the IJ appropriately weighed the country reports against Singh’s testimony and the affidavits submitted by Singh’s wife, father, and village sarpaneh stating that Indian police continue to search for him. As noted, we decline to adopt the IJ’s adverse credibility determination because the BIA did not expressly do so. But “[t]he general principle requiring the factfinder and a court of appeals to accept a petitioner’s factual contentions as true in the absence of an adverse credibility finding does not prevent us from considering the relative probative value of hearsay and non-hearsay testimony.” Gu v. Gonzales, 454 F.3d 1014, 1021 (9th Cir.2006). The IJ observed that Singh’s wife, father, and village sarpaneh “have not been questioned to determine the validity and accuracy of the statements, and this is especially problematic in light of the fact that the claims in the affidavits are completely at variance with the country condition evidence.” For this reason, the IJ concluded that “the affidavits are entitled to very little weight.” This determination, like the rest of the agency’s findings, is consistent with orn-ease law. See id. (“[W]here an asylum applicant’s testimony consists of hearsay evidence, the statements by the out-of-court declarant may be accorded less weight by the trier of fact when weighed against non-hearsay evidence.”); Sharma v. Holder, 633 F.3d 865, 870-71 (9th Cir.2011) (“The police, according to [the petitioner’s] hearsay recounting of what his father told him, did continue to threaten [the petitioner] after he came to the United States. But, because it is hearsay, the immigration tribunals were permitted to give this evidence less weight than the other evidence in the record.”). By contrast, the IJ reasoned that the country reports were “entitled to more weight by virtue of their objectivity and the fact that they are public, official documents, drafted to provide guidance to government officials.” See Sowe, 538 F.3d at 1285 (“U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations.” (internal quotation marks and citation omitted)).
The crux of our disagreement with the dissent appears to result from our straightforward application of the principle that the agency is entitled to weigh conflicting evidence. See Sharma, 633 F.3d at 871 (“[T]he immigration tribunals were permitted to give [certain] evidence less weight than the other evidence in the record.”). The dissent’s primary contention is that the country reports “provide[] little *836 information relevant to petitioner’s precise claim: that the police have specifically targeted him because of his past political activities and suspected support of militants, and that they continue to target him and his family.” Dissenting Op. at 838 (emphasis added). By framing the issue this way, the dissent glosses over the fact that the agency justifiably discounted Singh’s evidence that Indian police “continue to target him and his family” in light of the country report evidence showing that it is highly unlikely that Singh would be persecuted “because of his past political activities and suspected support of militants” or on account of any other protected ground.
We note again that the BIA did not adopt the IJ’s determination that Singh’s testimony was not credible. But there is a difference between an adverse credibility determination, on the one hand, and a decision concerning how to weigh conflicting evidence, on the other hand. Our decisions in Sharma and Gu plainly set out this distinction. See Sharma, 633 F.3d at 871; Gu, 454 F.3d at 1021 (“The general principle requiring the factfinder and a court of appeals to accept a petitioner’s factual contentions as true in the absence of an adverse credibility finding does not prevent us from considering the relative probative value of hearsay and non-hearsay testimony.”). We have also recognized this same concept in related contexts. For example, in Zehatye v. Gonzales, 453 F.3d 1182 (9th Cir.2006), we assumed that the petitioner’s testimony in support of her asylum application was true because the Board did not make an express adverse credibility determination. Id. at 1185 & n. 5. Although we assumed that the petitioner’s statements were true, we nevertheless compared her evidence that she would be persecuted in her country of origin with a country report that was generally at odds with her testimony. Id. at 1185-87. We denied the petition for review based on the evidence in the country report even though we acknowledged that the report suggested that members of the petitioner’s group were persecuted “under some circumstances.” Id. at 1185. Similarly, in Aden v. Holder, 589 F.3d 1040 (9th Cir.2009), the IJ and the BIA denied the petitioner’s asylum application without making an adverse credibility determination. Id. at 1043. The petitioner testified that he was persecuted on account of his membership in a particular clan, but the IJ could not confirm that the relevant clans existed “because none of the country materials produced by either side mentioned” the names of the clans described by the petitioner. Id. at 1042. The petitioner produced letters that supported the existence of the persecuted clan of which he claimed to be a member, but we explained that such evidence “does not enable us to substitute our judgment about the persuasiveness of this corroboration for the BIA’s.” Id. at 1046. We denied the petition for review. Id. at 1047. The bottom line is that we regularly permit immigration tribunals to afford country report evidence more weight than contrary evidence offered by the petitioner even though they have not made an adverse credibility determination because there is a difference between testimony that is not credible and evidence that is not entitled to much weight. See id. at 1045 (“Apparently honest people máy not always be telling the truth, apparently dishonest people may be telling the absolute truth, and truthful people may be honestly mistaken or relying on unreliable evidence or inference themselves.”).
In Aden, we offered an example that is particularly useful here: “[I]f, hypothetically, the IJ said ‘you seem like an honest person, but the country report says that the [clan of which the petitioner is a member] is treated with great respect and nev *837 er hindered in any way by the [other] clans,’ [the IJ] would weigh persuasiveness in light of the whole record including such evidence.” Aden, 589 F.3d at 1044-45. That is the situation the IJ confronted in this case. The government introduced country reports containing ample evidence that individuals who were persecuted because of their involvement with Sikh militant groups are no longer likely to be persecuted in India. The petitioner introduced declarations from his wife, father, and village sarpanch stating that Indian police were still searching for him. The IJ then followed our instructions in Aden by weighing the “persuasiveness” of the country report evidence “in light of the whole record including such evidence.” Id. at 1045. Citing our decision in Gu, the IJ reasoned that “the declarants have not been questioned to determine the validity and accuracy of the statements, and this is especially problematic in light of the fact that the claims in the affidavits are completely at variance with the country condition evidence. As such the affidavits are entitled to very little weight.”
The dissent departs from our case law when it requires the country reports to reveal “country conditions for individuals previously persecuted and currently wanted by police” without accounting for the fact that the agency appropriately discounted the evidence showing that Singh is “currently wanted by the police.” Dissenting Op. at 838. The dissent proposes what amounts to a two-step framework: first, the petitioner’s evidence that he will be persecuted is given full weight; and second, the country report evidence is analyzed through the lens of the petitioner’s evidence. This novel approach disregards the cases where we have permitted the agency to compare country report evidence with the petitioner’s evidence that he will be persecuted and to conclude that the petitioner’s evidence is not entitled to much weight. See Gu, 454 F.3d at 1021; see also Aden, 589 F.3d at 1044-46; Zehatye, 453 F.3d at 1185-87.
Of course there might be instances where the agency weighs conflicting evidence in a manner that is not supported by substantial evidence. We have considered and rejected that possibility here in light of the comprehensive and precise country reports showing that individuals are unlikely to be persecuted because of their involvement with Sikh separatist groups. The agency properly performed its core functions of weighing conflicting evidence, bringing its expertise to bear, and articulating the rationale underlying its decision. We have no basis to disturb the agency’s determination.
IV
The IJ and the BIA determined that the government showed that there has been a fundamental change in circumstances such that Singh’s life or freedom would not be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion if he were removed to India. We conclude that this decision is supported by substantial evidence. Accordingly, the petition for review is DENIED.