THOMAS, Circuit Judge,
concurring in part and dissenting in part:
I agree with the majority that Sharma’s petition should be denied as to his claim under the Convention Against Torture, his motions to reopen, and his due process claim. I accordingly join parts I, III, IV, V, and VI of the majority opinion. However, I would grant the petition as to the asylum claim. Therefore, I concur in part, and I respectfully dissent in part.
I
Our precedent holds that “evidence ‘[t]hat the alleged persecutor acted because of a petitioner’s family’s political associations is sufficient’ to satisfy the motive requirement.” Silaya v. Mukasey, 524 F.3d 1066, 1070-71 (9th Cir.2008) (quoting Kebede v. Ashcroft, 366 F.3d 808, 812 (9th Cir.2004) (citing Lopez-Galarza v. I.N.S., 99 F.3d 954, 960 (9th Cir.1996))). Sharma has made the requisite showing here. At the time of his persecution, he was assisting his father, a history professor, with a book he was writing on Sikh nationalism. Sharma’s family “did not support” Sikh nationalism, but “did support the rights for which [the Sikhs] were fighting.” Sharma’s father and grandfather were both members of India’s Congress Party in the early 1980s (with Sharma’s grandfather occupying senior Party positions), but they left the Party to protest its violence against the Sikhs. There *875 after, Sharma’s father “guided” the Sikh Students Federation at Guru Nanak Khalsa College, where he taught. Sharma’s father testified that, “My work has lead [sic] me to be arrested and harassed and my son to suffer the brunt of the wrath of the Indian Government through the Punjab Police.”
Quoting Bhasin v. Gonzales, 423 F.3d 977, 985 (9th Cir.2005), the government repeats the old saw that “persecutors ‘do not always take the time to tell their victims all the reasons’ they are being harmed.” Here, however, Sharma’s persecutors did tell him why he was being detained and beaten: on account of his father’s political beliefs, which they imputed to him. Sharma testified that, as he was being beaten, the police “accused [him] and [his] father of helping the [Sikh] terrorist[s].” Sharma also testified that the police accused him of “trying to protect [his] father’s propaganda.” Sharma’s neighbor recounted that “[t]he police accused ... Sharma of being anti Govt and harassed him to prevent his father ... from working on his research.” The record compels the conclusion that Sharma’s persecutors attributed his father’s political opinion to him and persecuted him on account of it. Silaya, 524 F.3d at 1070.
If the police persecuted Sharma in part, or even primarily, to “stop Sharma’s father from publishing his book,” that ought have no effect on Sharma’s asylum claim. Sharma’s undisputed testimony, which the BIA found credible, establishes that Sharma’s persecution was politically motivated. “[W]here a persecutor has [mixed] motives for retaliating against a political opponent, the persecutor’s mixed motives do ‘not render the opposition any less political, or the opponent any less deserving of asylum.’ ” Zhu v. Mukasey, 537 F.3d 1034, 1043 (9th Cir.2008) (quoting Grava v. INS, 205 F.3d 1177, 1181 n. 3 (9th Cir.2000)). And the fact that “[t]he police never inquired into Sharma’s own political views” is equally immaterial. In Silaya, we found substantial evidence compelling a conclusion of persecution on account of a political opinion where “the [persecutors] knew who [the petitioner] was, knew who [the petitioner’s] father was, and made comments indicating that [the petitioner] was chosen as a victim because of [the petitioner’s] father’s [political views].” 524 F.3d at 1072. We characterized these as the facts “necessary to prove an imputed political asylum claim,” and did not require the petitioner to make any showing that the persecutors inquired after the petitioner’s own political opinions. Id. Sharma has put forward ample evidence demonstrating these facts, and his petition for review ought to be granted.
Sangha does not compel a contrary conclusion. There, we held that “[i]f the persecutor attributed a political opinion to the victim, and acted upon the attribution, this imputed view becomes the applicant’s political opinion as required under the [INA].” 103 F.3d at 1489. Here, as described above, Sharma has shown “that his persecutors actually imputed a political opinion to him.” Id. By contrast, the court in Sangha relied on the fact that, there, the persecutors “never expressly said that [they were persecuting] Sangha because of his father’s views,” 103 F.3d at 1489-90, and in prior altercations had focused entirely on Sangha’s father, and not Sangha, id. at 1490. Whereas Sangha’s persecutors “ignored” him, id., Sharma’s persecutors — in the words of the government— “targeted” him, in part because they knew that his father’s political ties made his father immune from harassment. Our decision in Sangha supports Sharma’s claims.
II
The government asserts that, even if we were to hold that Sharma had suffered *876 past persecution, a change in circumstances undermines any presumption that Sharma’s fear of future persecution is well-founded. Where there is past persecution, “a rebuttable presumption of a well-founded fear arises ... and the burden shifts to the government to demonstrate,” by a preponderance of the evidence, “that there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear.” Tawadrus v. Ashcroft, 364 F.3d 1099, 1103 (9th Cir.2004) (citing 8 C.F.R. § 1208.13) (internal quotation marks omitted). Here, the government has not met its burden.
First, the BIA’s conclusion that “[t]here is no recent evidence to corroborate [Petitioner’s] claim that the authorities would still wish to harm” him is premised on a misreading of the record. In its initial decision, the BIA recounted that Sharma was threatened with death by the police only before his father delivered his research materials to them, and concluded therefore that the danger to Sharma had passed. However, the BIA misstated the record, which shows that Sharma’s persecution persisted after his father handed over his research and stopped working on his book. In late 1999, Sharma and his father began delivering Sharma’s father’s research to the police in order to mollify them. Despite this, on January 24, 2000, the police detained Sharma for three days and beat him “every day.” Sharma was released when his father “agreed that he would stop his research and hand ... over the papers” to the police, which he did. Nonetheless, shortly thereafter the police visited Sharma’s home, told his “father that the research papers [were] not complete,” and threatened that they would kill Sharma. Sharma also testified that, in the years since he left India, the police have continued to visit his family’s home and to threaten to kill him if he returns. Therefore, as the government acknowledges, the BIA erred when it found that Sharma was only threatened prior to his father promising to cease work on his book and hand over his research materials.
The government points to additional reasons why Sharma’s claim of a well-founded fear is undermined, but it does not rebut the presumption that operates in Sharma’s favor. The government emphasizes that Sharma’s father remains unharmed and cites Hakeem v. INS, 273 F.3d 812 (9th Cir.2001), for the proposition that Sharma’s claim is “weakened, even undercut, when similarly-situated family members continue to live in the country without incident.” Id. at 816. But “the facts in Hakeem are entirely distinguishable from those in this case; critically, the family members at issue in Hakeem were in fact ‘similarly situated,’ whereas here they are not.” Kumar v. Gonzales, 444 F.3d 1043, 1055 (9th Cir.2006). Hakeem’s family members remained safe in Hakeem’s former home despite changing their religion — the very same behavior on account of which Hakeem claimed threats and sought asylum. Id. Here, Sharma testified that his father’s immunity from violence and direct threats is explained by his father’s standing and “links” in the community. Sharma was targeted, in part, because his father could not be. Sharma and his father are not similarly situated.
The government also notes that Sharma “received a valid passport and visa at a time Indian authorities ‘were allegedly interested him,’ ” and cites Espinoza-Martinez v. INS, 754 F.2d 1536 (9th Cir.1985), for the proposition that “easy acquisition of [a] passport cuts against petitioner’s argument that he will be individually persecuted upon return.” However, it was not at all “easy” for Sharma to acquire the passport and visa that enabled him to leave India and enter the U.S. While he had gotten and renewed a passport through normal channels in the past, in *877 order to procure a passport after the police harassment began, Sharma paid an “agent” 750,000 rupee, or more than $16,000 at today’s exchange rate of 46 rupee per dollar. Espinoza is distinguishable, as there, the petitioner “acquired a ... passport without difficulty.” 754 F.2d at 1540.
Ill
Substantial evidence supports the conclusion that Sharma was persecuted on account of a protected ground, and that the government has not met its burden of rebutting the presumption that Sharma has a well-founded fear of future persecution. I would grant the petition for review as to Sharma’s asylum claim.