**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

LETEKIDAN UKABANIKIEL HAILE,
                          *Petitioner,*

v.

ERIC H. HOLDER Jr., Attorney
General,
                          *Respondent.*

Nos. 06-74309
      09-70779

Agency No.
A078-357-911

OPINION

On Petition for Review of Orders of the
Board of Immigration Appeals

Argued and Submitted
May 10, 2011—San Francisco, California

Filed September 26, 2011

Before: Ronald M. Gould and Milan D. Smith, Jr.,
Circuit Judges, and Algenon L. Marbley, District Judge.*

Opinion by Judge Gould

---

*The Honorable Algenon L. Marbley, United States District Judge for
the Southern District of Ohio, sitting by designation.

18305

**COUNSEL**

Ajai Mathew (argued), Law Office of Manpreet S. Gahra, Berkeley, California, for petitioner Letekidan Ukabanikiel Haile.

Paul F. Stone (argued), Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for respondent Eric H. Holder Jr. Tony West, Assistant Attorney General, Civil Division, Washington, D.C., and Michael P. Lindemann, Assistant Director, Office of Immigration Litigation, Washington, D.C., were also on the brief.

## OPINION

GOULD, Circuit Judge:

In these consolidated petitions for review, Petitioner Letekidan Ukabanikiel Haile challenges two decisions of the Board of Immigration Appeals ("BIA"). The first challenge is to the finding that she was statutorily ineligible for asylum, withholding of removal and protection under the Convention Against Torture ("CAT") in the form of withholding of removal based on the terrorism bars in 8 U.S.C. § 1158(b)(2)(A)(v), and the second is to the finding that she is not entitled to deferral of removal under the CAT. Because we hold that the BIA's conclusions that the ELF is a terrorist organization and that Haile engaged in terrorist activities are supported by substantial evidence and that we lack jurisdiction to address other arguments raised by Haile, we deny in part and dismiss in part those aspects of the petitions for review. However, because the record compels the conclusion that the Petitioner has demonstrated that it is more likely than not that upon a return to Eritrea she will be tortured by or with the acquiescence of the Eritrean government, we grant the relief of deferral of removal under the CAT.

## I

Haile is a native of Ethiopia and a citizen of Eritrea.[1] She entered the United States with a tourist visa in 1999 but stayed beyond the authorized period. In 2000, Haile filed an application for asylum but her application was denied, and the Department of Homeland Security ("DHS") initiated removal proceedings against her on the charge that she had remained in the United States without authorization. 8 U.S.C. § 1227(a)(1)(B). In removal proceedings, Haile conceded

---

[1]Haile was born in the city of Asmara within Eritrea in 1956, when Eritrea was part of Ethiopia. Eritrea gained independence from Ethiopia in 1991.

removability and applied for relief from removal in the form of asylum, withholding of removal, and protection under the CAT.

According to Haile's testimony, which the Immigration Judge ("IJ") found credible, she joined the Eritrean Liberation Front ("ELF") in 1977. The ELF is an organization that fought for Eritrea's independence from Ethiopia. Haile stated that the ELF used violence and employed weapons (i.e., guns) in the fight for independence and for the forcible overthrow of the Ethiopian government. Haile had "heard about" members of the ELF attempting to hijack an Ethiopian airline flight, but denied knowing about other specific ELF activities. DHS submitted a set of "incident profiles" from the website of the Memorial Institute for the Prevention of Terrorism ("MIPT") that described terrorist acts perpetrated by the ELF, including kidnappings, hijackings of aircraft, shootings, and car bombings. The incident profiles were admitted over the general objection of Haile's counsel.

As a member of the ELF, Haile "organiz[ed] women" and "would gather and collect fund [sic] or contribute fund [sic]" to the ELF. Using the funds she collected, she sent "provisions like sugar, cigarettes, and shoes" to the ELF through a contact. Haile also collected and passed on documents, the precise contents of which she did not know, but she believed that the documents contained information about how to attack or target the enemy and that the documents would have had a negative impact on the Ethiopian government. A letter from an ELF official confirmed that Haile was "a member of the under-ground cells" in Asmara and that she "was participating in collecting informations [sic] of the enemy, gathering necessary materials for the ELF army, and organi[z]ing Eritrean women to join the organi[z]ation and struggle for their emancipation secretly."

Haile testified that, in 1978, she was arrested by members of the Eritrean People's Liberation Front ("EPLF"), a rival

pro-independence organization and detained for a month under poor conditions. Haile was arrested again in 1979, this time by agents of the Ethiopian government, and detained for about a year. She was interrogated and subjected to brutal treatment.[2] A judge sentenced Haile to five years' imprisonment, and she served about three years of that sentence. Conditions in prison were poor: there were mice and rats, few bathrooms for many prisoners, and "criminals and crazy people" mixed in with political prisoners. When she returned to Asmara, the ELF "had left the area," but she remained an ELF member until 2002.

Haile fled Eritrea in 1999. A local official and EPLF member named Mohammed Ibrahim had asked to marry her and she had declined. He then showed her a list of members of the ELF who were targeted for arrest, and the list had her name on it. Haile believes that because she refused his marriage offer, if she returns anywhere in Eritrea, Ibrahim would have her killed. Haile testified that ELF members are arrested in Eritrea for voicing their views. She also testified that soldiers had taken her father from his home about ten months prior to the removal hearing, and that her father was interrogated by local officials about Haile and her escape from the country. This account was in part corroborated by a letter from Haile's son that was admitted into evidence, although Haile blamed Ibrahim for the arrest of her father while the letter referred to "soldiers." The letter said that Haile's father died at home from pneumonia after his three-day period of detention, during which he was made to sleep on a cold cement floor. Haile's sister was also arrested, and Haile's son was taken to the police station because he accused the government of causing the death of Haile's father. Haile also submitted supportive reports and articles regarding country conditions in

---

[2]Her interrogators bound her hands and stomped on her back; stuffed her mouth with bloody clothing; suspended her upside-down and beat the soles of her feet with electric wire; and shot other prisoners in front of her. The interrogation related to her involvement with the ELF.

Eritrea, including information on human rights abuses and treatment of political prisoners.

The IJ denied all relief and ordered Haile removed. After reviewing all testimony and evidence, the IJ found, among other things, that the ELF falls within the definition of a terrorist organization, that Haile was a member of the ELF, and that Haile had engaged in terrorist activities. The IJ concluded that Haile was statutorily barred from eligibility for asylum, withholding of removal, and CAT protection in the form of withholding. The IJ denied CAT protection in the form of deferral of removal because Haile did not show that it is "more likely than not" that she would suffer torture upon removal to Eritrea.

Haile appealed to the BIA, but to no avail because the BIA dismissed the appeal, agreeing with the IJ that Haile was ineligible for asylum and withholding and that she did not demonstrate entitlement to deferral of removal under CAT. The BIA found no error in the IJ's finding that the ELF was a terrorist organization. While the IJ appeared to have found Haile ineligible for relief because she had engaged in terrorist activities under § 1182(a)(3)(B)(i)(I), the BIA held that the IJ properly found that Haile was ineligible based on her membership in a terrorist organization, citing § 1182(a)(3)(B)(i)(VI).

After Haile filed an opening brief on appeal to us, the government filed a motion to reopen with the BIA. The BIA agreed sua sponte to reconsider its decision and issued a second decision supplementing its earlier decision. In its second decision the BIA (1) reaffirmed its decision that the IJ correctly determined that the ELF was a terrorist organization; (2) affirmed the IJ's conclusion that Haile was barred from relief for engaging in terrorist activities "based on her activities with and material support of ELF;" and (3) expanded its reasoning with respect to the denial of deferral of removal under CAT. Haile petitioned for review of the second decision of the BIA.

## II

We have jurisdiction over the petitions for review under 8 U.S.C. § 1252(a). *See Khan v. Holder*, 584 F.3d 773, 779-80 (9th Cir. 2009) (noting jurisdiction over similar claims and recognizing that *Bellout v. Ashcroft*, 363 F.3d 975 (9th Cir. 2004), which held to the contrary, was decided before passage of the REAL ID Act). Where, as here, the BIA conducts a de novo review of the IJ's decision, the court's review is "limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted." *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006) (quotation marks omitted). Questions of law are reviewed de novo. *Hamazaspyan v. Holder*, 590 F.3d 744, 747 (9th Cir. 2009). We review factual findings and determinations of mixed questions of law and fact for substantial evidence. *Khan*, 584 F.3d at 776. Findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary. § 1252(b)(4)(B); *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).

## III

**[1]** Aliens who have engaged in terrorist activities are precluded from seeking several forms of relief from removal, including asylum, withholding, and CAT protection in the form of withholding, but remain eligible for deferral of removal under the CAT. *See Khan*, 584 F.3d at 777; *see also* 8 U.S.C. § 1182(a)(3)(B)(i) (stating terrorism-related grounds of inadmissibility); 8 U.S.C. § 1227(a)(4)(B) (providing for terrorism-related grounds of deportability by reference to § 1182(a)(3)(B), (F)); 8 U.S.C. § 1158(b)(2)(A)(v) (West 2004) (stating, in effect, that an alien who is inadmissible or deportable on terrorism-related grounds is ineligible for asylum); 8 U.S.C. § 1231(b)(3)(B)(iv) (same for withholding of removal); 8 C.F.R. § 1208.16(d)(2) (same for withholding under the CAT); 8 C.F.R. § 1208.17 (directing that aliens eligible for CAT protection but subject to terrorism-related bars

be granted deferral of removal).[3] "Thus, if an alien 'has engaged in a terrorist activity' under § 1182(a)(3)(B)(iv) at any time, he is ineligible for both asylum and withholding of removal." *Khan*, 584 F.3d at 777.

**[2]** The INA defines "engage in terrorist activity," "terrorist activity," and "terrorist organization" broadly. *See id.* The definition of "terrorist organization" includes "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv)."[4] 8 U.S.C. § 1182(a)(3)(B)(vi)(III).

The term "engage in terrorist activity," as applied to an individual or an organization, includes the following: "to gather information on potential targets for terrorist activity;" "to solicit funds or other things of value for . . . a terrorist activity" or "a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist

[3]The REAL ID Act, enacted on May 11, 2005, amended several of the relevant statutes. REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231. Haile filed her application for asylum before enactment of the REAL ID Act, so the amendments to § 1158(b)(1) pertaining to burdens of proof and credibility determinations for asylum applications and the amendments to § 1158(b)(2) pertaining to the terrorism-related bars for asylum do not apply. *See* Pub. L. No. 109-13, § 101, note 2 (2005) ("The amendments . . . shall take effect on [May 11, 2005] and shall apply to applications for asylum, withholding, or other relief from removal made on or after such date."). However, the amendments to § 1182, which expanded the definitions of terrorist organizations and terrorist-related activities, were given retroactive effect. Thus, the post-REAL ID Act version of § 1182 applies to this appeal. *See Khan*, 584 F.3d at 778-79.

[4]Organizations that meet this definition are also known as "Tier III" terrorist organizations, by contrast to Tier I and Tier II terrorist organizations that have been specially designated as such. *See* 8 U.S.C. § 1182(a)(3)(B)(vi)(I)-(III); *Khan*, 584 F.3d at 786 (Nelson, J., concurring).

organization;" "to solicit any individual . . . to engage in conduct otherwise described in this subsection" or "for membership in a terrorist organization as described in clause (vi)(III)" (again unless the solicitor can demonstrate lack of knowledge); and

> to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons . . . , explosives, or training . . . to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

8 U.S.C. § 1182(a)(3)(B)(iv)(III)-(VI).

A "terrorist activity" is:

> any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:
>
> > (I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).
> >
> > (II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing

any act as an explicit or implicit condition for the release of the individual seized or detained.

(III) A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person.

(IV) An assassination.

(V) The use of any—

(a) biological agent, chemical agent, or nuclear weapon or device, or

(b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

(VI) A threat, attempt, or conspiracy to do any of the foregoing.

8 U.S.C. § 1182(a)(3)(B)(iii).

The BIA held that the IJ correctly found that the ELF qualifies as a terrorist organization because "the group committed a number of violent acts . . . including assassinations, kidnappings, and hijackings," which come within the definition of terrorist activity under § 1182(a)(3)(B)(iii). The BIA also upheld the IJ's finding that Haile engaged in terrorist activities "based on her activities with and material support of ELF, including recruiting members, collecting funds, passing along documents, collecting information on the enemy, and providing materials and provisions to ELF." The BIA expressly

cited subsections (III) through (VI) of § 1182(a)(3)(B)(iv), which refer to gathering information on potential targets; soliciting funds for a terrorist organization; soliciting membership in a terrorist organization; and committing an act that the individual knows or reasonably should know affords material support to an individual who has committed or plans to commit a terrorist activity or to a terrorist organization. The BIA concluded that Haile was statutorily ineligible for asylum and withholding because she engaged in terrorist activities.

## A

**[3]** Haile asserts that two of the BIA's central conclusions —that the ELF is a terrorist organization and that she engaged in terrorist activities—are not supported by substantial evidence. We disagree.

## 1

**[4]** Substantial evidence in the record supports the BIA's finding that the ELF falls within the broad statutory definition of a "Tier III" terrorist organization. There is documentary evidence in the record, in the form of the MIPT incident profiles, that the ELF carried out several activities described in § 1182(a)(3)(B)(iii), including kidnapping, assassination, bombing, and hijacking (as well as other attempts to carry out these acts). Haile's testimony was consistent with the documentary evidence: she testified that the ELF employed violence, including the use of guns, to fight for the overthrow of the Ethiopian government, and that she had heard about members of the ELF attempting to hijack an airplane.

Haile argues that the MIPT incident profiles are "hearsay and bear no indicia of reliability or trustworthiness," and that the BIA's reliance on them as evidence of ELF's terrorist activities violated due process.[5] Haile misapprehends the evi-

---

[5]Although the BIA did not expressly address Haile's due process argument, which Haile framed as such for the first time in her brief before us, the BIA's explicit reliance on the MIPT reports demonstrates that it considered the evidence and deemed it reliable.

dentiary rules governing proceedings in federal agencies such as the BIA. "The sole test for admission of evidence is whether the evidence is probative and its admission is fundamentally fair." *Espinoza v. INS*, 45 F.3d 308, 310 (9th Cir. 1995). Haile has not "cast doubt on the probative value or fairness of the evidence presented," nor did she present "any contrary evidence" to challenge the reliability of the incident profiles. *Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 824 (9th Cir. 2003); *see also Khan*, 584 F.3d at 785 (relying in part on newspaper reports of terrorist attacks to satisfy elements of the statutory terrorism bars); *Hussain v. Mukasey*, 518 F.3d 534, 539 (7th Cir. 2008) (citing to the MIPT website in discussion of a terrorist organization's activities). Under these circumstances, the admission of the MIPT incident profiles did not violate due process, and her hearsay challenges to the MIPT reports are unavailing.

[5] Haile also contends that, to meet the definition of a terrorist organization, DHS must show that the group in question qualifies as a terrorist organization both at the time of the removal hearing and during the period when the alien was engaged in terrorist activities, and that the record in this case does not support such a conclusion. We need not decide whether Haile's interpretation of the statutory term is correct, because substantial evidence in the record supports that terrorist activities were perpetrated by the ELF from 1969 through 1991, including during the period when Haile was an active member,[6] and Haile testified that ELF was engaging in violent activities for the overthrow of the government as late as 2002. Haile does not direct us to any evidence in the record to suggest—much less compel the conclusion—that the ELF

---

[6]Haile argues that DHS did not meet its burden because the majority of the MIPT incident profiles describe terrorist activities that occurred before 1977 and after 1979, and that profiles of incidents in 1977 and 1978 should be disregarded because the 1977 attempted hijacking might have predated Haile's involvement, and the 1978 incident profile is unreliable. Haile's parsing of the evidence in this manner does not compel a different conclusion than that reached by the BIA.

ceased planning or perpetrating terrorist activities at some point before the 2005 removal hearing. The record reasonably supports the BIA's finding that the ELF satisfies the statutory definition of a terrorist organization, even under Haile's interpretation of its requirements.

**2**

Haile also challenges the BIA's conclusion that she "engaged in terrorist activities" with two principal contentions: (1) that the record cannot support a finding that Haile's activities constituted "material support" of a terrorist organization; and (2) that the BIA did not properly consider whether Haile knew or reasonably should have known that the ELF was a terrorist organization. Both arguments fail in light of the record in this case, and even were we to assume they had merit, they are not dispositive of the petitions for review because Haile does not challenge several other independent statutory bases for the BIA's decision that Haile engaged in terrorist activities.

**[6]** Section 1182(a)(3)(B)(iv)(VI) states that the term "engage in terrorist activity" includes "commit[ing] an act that the actor knows, or reasonably should know, affords material support" for a terrorist activity or to a terrorist organization, and that "material support" includes "a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons . . . , explosives, or training . . . ." § 1182(a)(3)(B)(iv)(VI). The BIA did not err in determining that Haile's activities, including collecting funds for the ELF, supplying the ELF with provisions such as sugar, shoes, and cigarettes, and passing along secret documents, amount in the aggregate to "material support." We have previously remarked on the broad scope of the terrorism bars, *Khan*, 584 F.3d at 786, and the definition of "material support" is broad enough to cover Haile's activities in this case. *See Singh-Kaur v. Ashcroft*, 385 F.3d 293, 299 (3d Cir. 2004) (noting that "material support"

is a broad concept that is not limited to the enumerated exam-
ples and deferring to the BIA's determination that the "provi-
sion of food and setting up tents" was within the definition of
"material support"); *In re S-K-*, 23 I & N Dec. 936, 943 (BIA
2006) (explaining the lack of "any legislative history which
indicates a limitation on the definition of the term 'material
support' " and observing that "Congress has not expressly
indicated its intent to provide an exception for contributions
which are de minimis"). The BIA's findings that Haile's con-
tributions constitute material support of a terrorist organiza-
tion under § 1182(a)(3)(B)(iv)(VI) survive substantial
evidence review.

Haile has not contested the BIA's finding that she engaged
in terrorist activities in other ways apart from providing mate-
rial support. The BIA determined that Haile had engaged in
terrorist activities under subsections (III) *through* (VI) of
§ 1182(a)(3)(B)(iv) because of her "activities with and mate-
rial support of ELF, including recruiting members, collecting
funds, passing along documents, collecting information on the
enemy, and providing materials and provisions to ELF." The
BIA found that Haile collected and passed on information that
would be used by the ELF against the enemy, i.e., the govern-
ment of Ethiopia, satisfying subsection (III) on gathering
information on potential targets for terrorist activity; collected
funds for the ELF, satisfying subsection (IV) on soliciting
funds or other things of value for a terrorist activity or organi-
zation; organized and recruited members, satisfying subsec-
tion (V) on soliciting any individual to engage in terrorist
activity or for membership in a terrorist organization; *and*
provided material goods to the ELF and collected and passed
on information in support of its mission, satisfying subsection
(VI) on committing an act that affords material support to a
terrorist organization. Thus, whether Haile provided material
support to the ELF under subsection (VI) is not dispositive of
whether she engaged in terrorist activities.

The material support provision, as well as several other
portions of § 1182(a)(3)(B)(iv) outlining the definition of "en-

gage in terrorist activity," provide for an exception if the actor can demonstrate by clear and convincing evidence that he or she did not know and should not reasonably have known that the organization was a terrorist organization. Contrary to Haile's assertions, the BIA addressed whether Haile knew or reasonably should have known that the ELF was a terrorist organization in its first decision, stating, "The respondent [Haile] has failed to demonstrate by clear and convincing evidence that she did not know, and should not reasonably have known, that the ELF was a terrorist organization." Although it did not provide extensive analysis of the issue, the BIA considered and decided that aspect of the statutory bar.

Haile had the burden to establish by clear and convincing evidence that she did not know, and should not reasonably have known, that the ELF was a terrorist organization, and the BIA's finding that she did not meet this burden is supported by substantial evidence. Haile testified that the ELF used armed violence against the Ethiopian government, and that she had heard about ELF members hijacking an airplane.[7] Haile did not present testimony or other evidence showing that she had a different and mistaken understanding of the nature of the ELF.

But even if that were not the case, Haile's argument on this point would fail because of the alternative grounds for the BIA's conclusion. The BIA relied on four different subsections of § 1182(a)(3)(B)(iv) in finding that Haile engaged in terrorist activities, and only three of those subsections have an

---

[7]Although Haile's testimony regarding the attempted hijacking might be regarded as ambiguous, our review is limited to a determination of whether the agency decision is "supported by reasonable, substantial, and probative evidence on the record considered as a whole" and we are precluded from "independently weighing the evidence." *Gu v. Gonzales*, 454 F.3d 1014, 1018-19 (9th Cir. 2006) (internal citations and quotation marks omitted). Given her testimony as a whole, a reasonable factfinder would not be compelled to conclude that Haile did not know that ELF members attempted to hijack a plane.

exception if the alien can show by clear and convincing evidence that he or she did not know and should not reasonably have known that the organization was a terrorist organization. Subsection (III), which refers to gathering information on potential targets for terrorist activity, does not contain such an exception. As explained above, Haile does not challenge the BIA's reliance on subsection (III), focusing instead on the question of whether she committed acts that afforded material support to a terrorist organization. Because subsection (III) does not contain a knowledge exception, Haile's arguments urging that the BIA inadequately addressed whether she knew or reasonably should have known that the ELF was a terrorist organization cannot support her request for relief in the form of remand on the issue of knowledge.

**[7]** In light of the record as a whole and the facts as found by the IJ, the BIA correctly concluded that Haile is ineligible for asylum, withholding of removal, and protection under the CAT in the form of withholding because she engaged in terrorist activities in support of a terrorist organization, the ELF.

**B**

On account of her prior membership in the ELF, Haile is statutorily barred from asylum and withholding of removal under the INA. *See* 8 U.S.C. § 1182(a)(3)(B)(i). Ordinarily an alien may seek relief under the CAT, in at least these two forms: (1) withholding of removal under 8 C.F.R. § 1208.16(c) for aliens who are not barred from eligibility for asylum and withholding of removal and (2) deferral of removal under 8 C.F.R. § 1208.17(a) for aliens entitled to protection but subject to mandatory denial of withholding. *See Aguilar-Ramos v. Holder*, 594 F.3d 701, 704 (9th Cir. 2010); *see also Hosseini*, 471 F.3d at 958-59. Haile, because she is ineligible for asylum and withholding of removal as an alien who engaged in terrorist activities, is only eligible for the CAT relief of deferral of removal under 8 C.F.R. § 1208.17(a).

**[8]** Haile contends that the BIA erred in denying deferral of removal. We have jurisdiction over this claim because the IJ denied Haile's request for deferral of removal on the merits. *See Lemus-Galvan v. Mukasey*, 518 F.3d 1081, 1084 (9th Cir. 2008). We review whether "substantial evidence" supports the BIA's findings of fact. *Silaya v. Mukasey*, 524 F.3d 1066, 1070 (9th Cir. 2008). "Substantial evidence" means the BIA's determination is supported by "reasonable, substantial, and probative evidence on the record." *Morales v. Gonzales*, 478 F.3d 972, 983 (9th Cir. 2007) (quotation marks omitted).

**[9]** To receive deferral under the CAT, an applicant must establish that it is "more likely than not" he or she will be tortured upon return to the country to which the alien is deported. 8 C.F.R. § 1208.17(a). Torture is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). The torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1); *see also Arteaga v. Mukasey*, 511 F.3d 940, 948 (9th Cir. 2007).

Neither of the BIA's decisions denying CAT deferral in this case was based on substantial evidence. The Board's decisions were based either on factual inaccuracies or hypothesized assumptions not grounded in the record. After issuing a cursory initial decision that flatly misstated key evidence,[8]

---

[8]The BIA's first decision for denial of CAT deferral provided the following: "[G]iven the objective evidence in the record, including the fact that the current president of Eritrea was a former ELF member, and the significant passage of time since the respondent faced any threats, the Immigration Judge properly [denied relief]." The Department of Homeland Security then alerted the Board that "[w]ith regard to the current president of Eritrea, there is evidence that, in addition to being a former ELF

the Board supplemented its reasoning with a decision that includes a litany of suppositions that the BIA thought Haile was making[9] about future events which would have to come to pass for Haile to be tortured or killed. This marshaling of purported suppositions of Haile did not constitute due consideration of the corroborated evidence that was presented by Haile.

**[10]** "The regulations implementing CAT explicitly require the IJ to consider 'all evidence relevant to the possibility of future torture.' " *Aguilar-Ramos*, 594 at 705 n.6; *see also Hernandez-Velasquez v. Holder*, 611 F.3d 1073, 1078-79 (9th Cir. 2010). This was not done here. Rather than point to evidence to support its conclusion, the Board recast Haile's

---

member, he became a member of the Eritrean People's Liberation Front (EPLF), which split off from ELF, and appears to have evolved into the current ruling party." Haile claims she fears persecution from the ELPF, not her former associates in the ELF. By not recognizing in its initial decision that the ELPF was a wholly different political group from the ELF, the BIA was entirely off the mark.

[9]In the second decision, the BIA gave this list of suppositions to support its denial:

> [Haile's] claim requires the following suppositions despite the significant passage of time: (a) Mr. Ibrahim is still able and willing to marry the respondent or is still disgruntled because she never accepted his offer of marriage; (b) Mr. Ibrahim would be able to track down the respondent upon her return to Eritrea; (c) Mr. Ibrahim still holds a position in the government; (d) Mr. Ibrahim has the authority to have the respondent added to the list; (e) Mr. Ibrahim would have the respondent's name added to the list; (f) the respondent would be arrested; and (g) the respondent would suffer torture while arrested. Given the number and speculative nature of these suppositions, the respondent has failed to establish that it is "more likely than not" she would suffer torture upon her return to Eritrea. *See Matter of J-F-F-*, 23 I & N Dec. 912, 918 n.4 (A.G. 2006) (stating that "an alien will never be able to show that he faces a more likely than not chance of torture if one link in the chain cannot be shown to be more likely than not to occur.").

substantiated evidence as speculative "suppositions" and stated that the significant passage of time rendered them unlikely to reoccur.

[11] The BIA's listed suppositions are each contradicted by record evidence proffered by Haile. First, while the Board posits that the "significant passage of time" since Haile left Eritrea makes future persecution unlikely, it ignores the facts recounted in a letter from Haile's son that soldiers were still harassing and arresting members of her family five years after she left Eritrea, due in part to their helping her to escape. Second, there is uncontroverted evidence from Haile's credible testimony that Ibrahim was responsible for the soldiers harassing her family, ultimately leading to her father's death from his mistreatment in prison. *See Kamalthas v. INS*, 251 F.3d 1279, 1282 (9th Cir. 2001) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.") (quotations omitted). Third, Haile testified that Ibrahim held a position in the ELPF government, which was not contradicted or shown to be no longer the case. There is also no dispute that Ibrahim possessed a list of ELF members whom he was capable of having arrested and that Haile's name explicitly was on this list. There is substantial, uncontroverted evidence that Haile has been targeted on account of her ELF membership by a powerful government official in Eritrea. Likewise, Haile has presented a strong motive for why the local government will continue to pursue her if she is returned.

The BIA also concluded that Haile did not present compelling evidence that she could not relocate in Eritrea, as she did shortly before her move to the United States. We are compelled to disagree. Although the record shows that Haile relocated twice—once for a few months to live with a friend and once to stay with her uncle while awaiting a passport—in neither of these instances was Haile safe from the threat of imprisonment and torture. Instead, the record shows that the police searched her friend's house while Haile was staying

there and that she avoided detection by pretending to be a
deaf mute and hiding beneath her head covering. The authori-
ties also searched her uncle's home, and she pretended to be
his maid and again pretended to be a deaf mute to avoid
answering their questions. Therefore, Haile has shown that
relocation in Eritrea will not change the likelihood of her
being subject to torture upon her return.

[12] Where Haile has made an allegation, she has sup-
ported it with facts in the record. This is especially so with
respect to the evidence she submitted about human rights
abuses in Eritrea, which the BIA dismissed as not indicative
of gross or mass human rights violations.[10] But the evidence
of danger to political prisoners who are arrested, as Haile
would be if returned, is more than abundant. Even the BIA
acknowledged that "there is background evidence in the
record indicating that the Eritrean government has a poor
human rights record." This, however, is an understatement,
and one likely to cause grave harm to Haile. *See also Nuru v.
Gonzales*, 404 F.3d 1207, 1218-19 (9th Cir. 2005) (describing
reports of human rights abuses in Eritrea by the police and
military). In 2003, the State Department reported that there
were numerous cases in which police had resorted to torture
and physical beatings of prisoners, particularly during interro-
gations. In 2005, Amnesty International reported that the Eri-
trean government arrested hundreds of people for their
political and religious beliefs and that, since a major crack-
down on political dissent in 2001, thousands of political pris-
oners were being held indefinitely without charge or trial,
many incommunicado and in secret detention places.
Although the BIA found this evidence insufficient, evidence
that is neither contradicted, rebutted nor impeached, while

---

[10]The BIA's reasoning is as follows: "[A]lthough there is background
evidence in the record indicating that the Eritrean government has a poor
human rights record, there is not evidence of gross or mass human rights
violations in Eritrea such that it is 'more likely than not' that the respon-
dent would be imprisoned and tortured upon her removal to Eritrea."

supporting only one reasonable inference, satisfies the standard Haile was required to meet.

**[13]** The BIA improperly recast corroborated evidence as "speculative." The BIA did not give due account for record evidence supporting Haile's position or adequately explain its denial of deferral. Substantial evidence does not support the BIA's conclusion that Haile did not establish that it is more likely than not that she would be tortured if returned to Eritrea. Because the evidence Haile presents compels but one conclusion and is unrebutted, there is no reason to remand in this case—we hold that Haile is entitled to deferral of removal under the CAT.

## C

Haile raises other challenges to the BIA's decision that we either need not address or that fall outside of our jurisdiction. As Haile concedes, we need not entertain arguments related to the issue of whether Haile poses a "danger to the security of the United States" because the BIA did not rely upon that ground in affirming the IJ's conclusion that Haile is ineligible for asylum and withholding.[11] Similarly, we do not address Haile's contentions with respect to the BIA's finding, in its first decision, that Haile is ineligible for relief based on her membership in a terrorist organization. Because we hold that substantial evidence supports the BIA's subsequent finding that Haile engaged in terrorist activities, we need not address the prior finding of statutory ineligibility based on membership in a terrorist organization.

Haile did not exhaust the claim that the terrorism-related bars to eligibility for relief cannot be applied to her because she was not charged as removable under the terrorism-related

---

[11]An alien is ineligible for asylum if "there are reasonable grounds for regarding the alien as a danger to the security of the United States." 8 U.S.C. § 1158(b)(2)(A)(iv) (West 2004) (amended 2005).

provisions of 8 U.S.C. § 1227(a)(4)(B), so we do not have jurisdiction over that claim. *See Barron v. Ashcroft*, 358 F.3d 674, 678 (9th Cir. 2004). We also lack jurisdiction to address Haile's request that we remand the case for consideration of eligibility for a waiver under § 1182(d)(3)(B)(i) because the waiver issue was not raised before the agency, and because § 1182(d)(3)(B)(i) provides that the Secretary of State or the Secretary of Homeland Security, after appropriate consultation, "may determine in such Secretary's sole unreviewable discretion" whether to grant a waiver.[12]

The parties shall bear their own costs on appeal.

**PETITIONS DENIED IN PART, DISMISSED IN PART, AND GRANTED IN PART.**

---

[12]Although we lack jurisdiction over Haile's claims related to the waiver, nothing in our opinion would preclude Haile from pursuing such a waiver, and nothing in our opinion would restrict the discretion that might be exercised by the Secretary of State or the Secretary of Homeland Security.